Filed 6/21/23  P. v. Moreno CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>         v.<br><br>SANTOS CARLOS MORENO,<br><br>    Defendant and Appellant. | F084198<br><br>(Super. Ct. No. PCF367499)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following a jury trial, defendant Santos Carlos Moreno was convicted of attempted premeditated murder and various associated offenses.  On appeal, defendant asserts (1) prosecutorial misconduct, (2) instructional error, (3) erroneous denial of his

posttrial request to disclose juror information, (4) associated claims of ineffective assistance of counsel, and (5) cumulative error.  In the event we affirm, he also argues that the trial court violated Penal Code section 654[1] by imposing a concurrent sentence with respect to one count.  We reject each of these arguments and affirm the judgment in full.

## PROCEDURAL SUMMARY

By information filed on March 28, 2019, defendant was charged with attempted premeditated murder (§§ 187, subd. (a), 664, subd. (a); count 1), shooting at an occupied vehicle (§ 246; count 2), assault with a firearm (§ 245, subd. (a)(2); count 3), being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 4), and unlawful possession of ammunition (§ 30305, subd. (a)(1); count 5).  As to counts 1 and 2, the information alleged firearm enhancements for personal use (§ 12022.53, subds. (b)–(d)).  For all counts, it alleged that defendant had suffered three prior "strike" convictions within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), two prior serious felony convictions (§ 667, subd. (a)(1)), and three prior prison terms (§ 667.5, subd. (b)).

Following a trial,[2] on October 4, 2021, the jury convicted defendant on all charges, finding that the attempted murder was willful, deliberate, and premeditated, and also finding true the section 12022.53, subdivision (d) firearm enhancements for counts 1 and 2.  In a bifurcated proceeding, the trial court found true one of the prior conviction allegations and struck the section 667.5, subdivision (b) special allegations.[3]

---

[1]    All further statutory references are to the Penal Code unless otherwise stated.

[2]    At the close of evidence, the court denied defendant's oral section 1118.1 motion for acquittal asserting insufficient evidence.

[3]    With the parties' consent, the court trial proceeded before a different judge due to a scheduling conflict for the assigned judge.

As described in more detail below, the trial court denied defendant's motion for disclosure of juror contact information and his motion for new trial.

On March 30, 2022, the trial court sentenced defendant to prison for an aggregate determinate term of 14 years and four months, plus an indeterminate term of 39 years to life as follows: on count 3, the upper term of eight years, plus five years for the prior serious felony; on count 4, four years, concurrent with the term on count 3, stayed pursuant to section 654; on count 5, 16 months (one-third the middle term), consecutive to the term on count 3; on count 1, 14 years to life (doubled pursuant to § 667, subd. (e)(1)), plus 25 years to life for the firearm enhancement, consecutive to the term on count 5; and on count 2, the same 14 years to life plus 25 years to life but ordered to run concurrently with the term on count 1, and stayed pursuant to section 654.[4]  This appeal followed.

## FACTUAL SUMMARY

Because defendant does not challenge the sufficiency of the evidence supporting his convictions, we set forth only a general summary of the underlying facts to provide context for the arguments raised in this appeal.  In the early morning hours of June 30, 2018, 21-year-old Gabriel V. and his girlfriend Hannah B. were following a truck that they believed had hit one of their friends' vehicles, while doing "doughnuts" at the riverbank where Gabriel and Hannah's friends had been socializing that evening. Gabriel, the driver, followed the truck for about five minutes in an effort to record the license plate number and track the truck's location to report to the police.

Gabriel could not see the occupants of the truck very well, but he discerned two younger individuals between 16 and 18 years old in the front seats.  As it turned out, the truck was being driven by 14-year-old Dominic T., who was accompanied by his 17- or

---

[4]     For counts 1 and 2, the court stayed the prior serious felony enhancements (§ 667, subd. (a)(1)).

18-year-old friend, Julian V. Dominic saw that they were being followed and, not knowing how many angry older boys might be in the car chasing them, he called defendant for help. At the time, defendant was Dominic's mother's boyfriend. On the phone, Dominic told defendant that a group of "white boys" was chasing them, trying to kill him; and he asked defendant to help scare them off. Defendant told Dominic to drive to Dominic's grandmother's house on North 3rd Street, where defendant and Dominic's mother were staying.

With Gabriel and Hannah still following, Dominic drove to his grandmother's house and stopped the truck in the street. Neither Dominic nor Julian got out of the truck, and Gabriel started to slowly drive around the truck to leave—thinking this sudden stop was suspicious. As Gabriel was passing the truck, a man ran up to the car from one of the neighboring yards, cursing and pulling out a gun. Both Gabriel and Hannah saw the man raise the gun and heard him say " 'What's up, motherfucker?' " before Gabriel accelerated away. Just after accelerating, Gabriel and Hannah heard three gunshots, and Gabriel felt the second one hit him in the back of his shoulder. Neither of them saw the shots fired, and they did not look back toward the shooter. Instead, Gabriel sped around the corner before having to stop because of his injury. Police and medical responders arrived quickly and took Gabriel to the hospital after speaking to him and Hannah and some friends who had also come to his aid. The shooting occurred shortly after 3:00 a.m., based on witness testimony and records of the 911 call made at 3:27 a.m.

Based on descriptions provided by Hannah and Gabriel's friends, police detained Dominic and Julian in the truck within several minutes. Dominic and Julian testified that they had also heard three or four shots fired but did not see the shooter. They both ducked down, thinking their pursuers might be shooting at them. When Gabriel's car drove away, Dominic drove off, too. At trial, the prosecution also introduced a handwritten statement that Dominic had voluntarily given to an officer while being

4.

booked in juvenile hall.[5]  In relevant part, the statement read that a group of boys "chased me all the way home and [defendant] pulled a gun on them and I had got scared and left then got pulled over."  Dominic testified, however, that he only stated defendant "pulled a gun on them" because that is what the sheriffs had previously told him—not because he personally saw defendant with a gun.

Dominic also testified that because he was scared he initially gave a false oral statement to the officer who pulled him over—telling the officer he was just driving Julian home from a party, before telling the truth.  According to the officers who spoke with him, Dominic initially denied being in any altercations by the river or being chased that evening before ultimately providing the above written statement.  The officer who spoke with Julian testified that Julian also initially denied being at the river before later confirming he and Dominic had been kicking up dust in the truck and then were chased from the river.

At the hospital, when presented with a six-person photo line-up, Gabriel immediately identified defendant as the person who shot him; and he again identified defendant as the shooter at trial.

Meanwhile, an officer had been canvassing the neighborhood in the area where Hannah indicated the shooter appeared.  Among others, the officer spoke with the occupants of Dominic's grandmother's house, which included defendant and Dominic's mother (defendant's then girlfriend).  There was a detached garage on the property, where defendant would go once or twice a day.  After obtaining a search warrant, police broke into the locked garage and found a revolver inside a microwave on the ground.

---

**5**     As described by the officers, because Dominic was a juvenile, they could not question him without access to counsel once he became a suspect in the case; and they had been unable to contact the public defender's office.  However, because Dominic had asked during the ride to juvenile hall whether it would benefit him to tell the truth, the transporting officer suggested that Dominic could write a statement if he wanted to— emphasizing that it was entirely up to him.

The revolver contained three spent rounds and three live rounds. Elsewhere in the garage, police also found one .22-caliber round, which did not fit the revolver.

Defendant, Dominic, and Dominic's mother were all arrested in connection with the shooting, but only defendant was charged.

## DISCUSSION

### I. WITNESS VOUCHING

Defendant first contends that the prosecutor improperly vouched for Dominic and Julian's credibility as witnesses by virtue of certain remarks during their testimony. Acknowledging that no objection was made to these remarks at trial, defendant also alternatively argues ineffective assistance of counsel based on this omission.

#### A. *Additional Background*

Defendant first takes issue with the following statement by the prosecutor at the outset of Dominic's testimony: "And you're not in any kind of trouble, Dominic. I just want to tell you that." Defendant also asserts misconduct stemming from the following two exchanges between the prosecutor and Julian. Toward the end of direct examination, the prosecutor asked:

> "Okay. And so at some point, did you originally make a statement to Officer Ortiz -- well, let me just ask you this, and, you know, we're just here to … tell the truth now, and it's totally fine what happened in the past, but we just want to clear up anything. And, like I said, you're not in any kind of trouble whatsoever. I promise you that. But did you originally make a false statement to the officers when you were stopped?"

In response, Julian admitted that he had initially lied about Dominic just giving him a ride home from a party. Shortly after, the prosecutor shifted to having Julian identify a few pictures, prefacing his questions with the statement: "And you're doing just fine[,] Julian. You're doing okay."

Defendant argues that by telling Dominic and Julian they were "not in any kind of trouble," the prosecutor "signaled to the jury the prosecutor's assurance that [they] had

6.

lied to police but [were] telling the truth now" on the witness stand. According to defendant, the prosecutor was impermissibly placing the prestige of his office behind the witnesses, since "the jury undoubtedly knew that [they] *would* be in trouble if [they were] lying on the witness stand."

### B. Analysis

We agree with the People that defendant forfeited this prosecutorial misconduct claim by failing to object or seek an admonition regarding the challenged remarks at trial. (See *People v. Anderson* (1990) 52 Cal.3d 453, 478 ["Defendant failed to object, or seek an admonition, as to any of these remarks, and accordingly he cannot raise a claim of misconduct on appeal."].) Nevertheless, we exercise our discretion to reach the merits because doing so also disposes of defendant's parallel ineffective assistance claim.

"A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record." (*People v. Frye* (1998) 18 Cal.4th 894, 971 (*Frye*), disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390.) "Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial." (*Frye, supra,* at p. 971.) In other words, the prosecution "may not portray itself as a guarantor of truthfulness." (*U.S. v. Roberts* (9th Cir. 1980) 618 F.2d 530, 537.) When a claim of prosecutorial misconduct "focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

We are not persuaded that the challenged statements constituted "assurances regarding the apparent honesty or reliability" of Dominic or Julian's testimony. (*Frye*, *supra*, 18 Cal.4th at p. 971.) It was very early in Dominic's testimony when the prosecutor told Dominic that he was not in trouble, long before the subject of Dominic's

initial false oral statement came up. Dominic had just given his first narrative of the evening's events, acknowledging that he had been driving the truck erratically near other people at the river along with his friend Julian. With no suggestion at that point that Dominic might not be consistently truthful, it is far more likely the jury understood the prosecutor to be reassuring Julian that admitting to misbehavior at the river would not subject him to prosecution. Moreover, the transcript reflects that Dominic—who was only 18 years old at the time of trial—at first appeared understandably nervous and unfamiliar with testifying in open court. Dominic asked whether he was "going to get asked anything," expressed a desire for the courtroom audience to stop looking at him, and apologized for various small missteps several times at the beginning of his testimony. The trial court reassured him: "If you get nervous, don't worry about it." And the prosecutor reminded him: "[W]e just want the truth. There are no right or wrong answers here, obviously." Given this additional context, in all likelihood the jury understood the prosecutor's challenged statement shortly thereafter as offering general reassurance to a nervous, young witness.

As for Julian, who would have been 20 or 21 years old when he testified, the prosecutor's promise of no "trouble" directly prefaced his question of whether Julian originally made a false statement to the police when he and Dominic were stopped. However, we fail to see why the jury would make the logical leap defendant now asserts in order to interpret the prosecutor's statements as an assurance of Julian's present truthfulness. Defendant contends that, because the jury knew that Julian would be in trouble for perjuring himself on the witness stand, the prosecutor's assurance of no trouble implied that Julian could not be testifying falsely. Contrary to defendant's position, the prosecutor made it plain that Julian was not in trouble *for "what happened in the past."* (Italics added.) Far from assuring the jury that Julian was actually telling the truth in his present testimony, the prosecutor was assuring Julian that it was okay to tell the truth about having lied to authorities in the past. The prosecutor's "statement did

8.

not implore jurors to forego their independent assessment of the evidence and accept the prosecutor's word" that Julian was being truthful. (*Frye*, *supra*, 18 Cal.4th at p. 972.) Indeed, in his closing argument, the prosecutor argued in part that both Dominic and Julian had *lied* during portions of their testimony based on inconsistencies with other witnesses' recollections.

Finally, we see no misconduct in the prosecutor's last challenged statement telling Julian he was "doing just fine" and "doing okay." Reassuring a relatively young witness in such broad terms comes nowhere near a "government[] assessment that the witness is testifying truthfully." (*U.S. v. Roberts*, *supra*, 618 F.2d at p. 536.)

It is not reasonably likely the jurors would have understood any of the prosecutor's challenged statements to Dominic or Julian to "reflect any personal knowledge or information by the prosecutor." (*Frye*, *supra*, 18 Cal.4th at p. 972.)

## II.     INSTRUCTIONAL ERROR

Defendant next argues that the trial court committed prejudicial error by giving a flight instruction without substantial evidence, over his objection.

### A.     Additional Background

According to the investigating officer, Dominic's mother and defendant told him that on the night in question they both got home around 11:00 p.m. and went to sleep around 1:00 a.m.; they woke around 4:00 a.m. and went to Taco Bell before coming back home to eat around 4:10 a.m.; and defendant then went back to sleep until he was awoken by the police. Dominic's mother testified similarly and confirmed that it was after they got home from Taco Bell that police came to their house.

During discussion of jury instructions, defendant's trial counsel objected to the inclusion of CALCRIM No. 372, the flight instruction. The court overruled the objection, reasoning that "running off" to Taco Bell at 4:00 in the morning could be viewed as a flight.

9.

Accordingly, the jury received instruction No. 372, entitled "Defendant's Flight," which read: "If the defendant fled, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

As relevant, the jury also received instruction No. 200, regarding the jury's general duties. Instruction No. 200's closing directive stated: "Some of these instructions may not apply, depending on your findings about the facts of the case. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

### B. Relevant Law

"It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." (*People v. Hannon* (1977) 19 Cal.3d 588, 597 (*Hannon*).) "A flight instruction is proper whenever evidence of the circumstances of [the] defendant's departure from the crime scene or his usual environs … logically permits an inference that his movement was motivated by guilty knowledge." (*People v. Turner* (1990) 50 Cal.3d 668, 694.) " ' "[F]light requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested." ' [Citations.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.) "The evidentiary basis for the flight instruction requires sufficient, not uncontradicted, evidence." (*People v. Richardson* (2008) 43 Cal.4th 959, 1020; see *People v. Bonilla* (2007) 41 Cal.4th 313, 328 ["To obtain the instruction, the prosecution need not prove the defendant in fact fled, … only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence."].) An unsupported flight instruction warrants reversal only when there is a

10.

reasonable probability the erroneous instruction affected the verdicts.  (*Turner*, at p. 695 [applying the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836].)

    *C.  Analysis*

    The evidence of defendant's flight was admittedly slim in this case.  There is no evidence defendant ran from the scene or from police attempting to arrest him. Defendant did, however, leave his "usual environs"—the house where he was staying with Dominic's mother—located next to the scene of the shooting, at an unusually early hour of the morning, within about 40 minutes of the shooting.  (*People v. Turner*, *supra*, 50 Cal.3d at p. 694.)  Although it does not appear that defendant or the household had been contacted by police yet, the timing of defendant's departure was sufficient to allow a reasonable fact finder to infer that he left to avoid detection.  The testimony that defendant and Dominic's mother returned from Taco Bell within perhaps 10 minutes to eat at home supports defendant's explanation that they simply got hungry at an odd hour. However, "[a]lternative explanations for flight conduct go to the weight of the evidence, which is a matter for the jury, not the court, to decide."  (*People v. Rhodes* (1989) 209 Cal.App.3d 1471, 1477.)  The trial court properly fulfilled its threshold duty to ensure there was sufficient evidence from which the jury could find flight.  (*Hannon*, *supra*, 19 Cal.3d at pp. 597–598; *People v. Bonilla*, *supra*, 41 Cal.4th at p. 328.)

    Even assuming it was error to give the flight instruction, there was no reasonable probability the instruction affected the jury's verdict given the wording of instruction No. 372, the accompanying instruction No. 200, and the substantial surrounding inculpatory evidence.

    The wording of instruction No. 372 left to the jury the factual determination about whether flight occurred and the meaning of that flight.  The instruction read "*[i]f* the defendant fled," and "*[i]f* you conclude that the defendant fled .…"  (Italics added.)  And it specified that any flight "*may* show" defendant's awareness of guilt, though it was "up to you [the jury] to decide the meaning and importance" of any flight conduct.  (Italics

added.)  Thus, the flight instruction "did not posit the existence of flight; both the existence and significance of flight were left to the jury."  (*People v. Crandell* (1988) 46 Cal.3d 833, 870, overruled on another ground in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365.)  The flight instruction lacks the language held prejudicial in the consciousness-of-guilt instruction at issue in *Hannon*, *supra*, 19 Cal.3d 588, to which defendant attempts an analogy.  In *Hannon*, the instruction "clearly left open the possibility that *no* evidence of suppression may have been presented" by telling the jury, "Now, evidence, *if there was any in this case*, that the defense attempted to suppress any evidence .…"  (*Id.* at p. 597, fns. 3 & 4.)  The present flight instruction left it for the jury to determine whether flight had been proved, without leaving open the possibility that there was zero evidence of flight.

Over the years, our Supreme Court has repeatedly held that the permissive language of flight instructions worded similarly to this one renders harmless any instructional error.  (See *People v. Elliott* (2012) 53 Cal.4th 535, 584; *People v. Richardson*, *supra*, 43 Cal.4th at p. 1020; *People v. Visciotti* (1992) 2 Cal.4th 1, 61.)  Courts of Appeal have followed suit.  (See *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 502 [holding harmless CALCRIM No. 372 instruction that "expressly informed the jury that, *if* it found defendant tried to kill himself while in custody, it was the sole judge of 'the meaning and importance' of defendant's suicide attempts"]; *People v. Vega* (2015) 236 Cal.App.4th 484, 503 [holding harmless CALCRIM No. 361 instruction on failure to explain or deny adverse evidence that left "the 'meaning and importance' of the failure to explain or deny in the jurors' hands"].)

Harmlessness is often bolstered by the presence of an accompanying jury instruction that not all instructions provided will necessarily apply to the facts as found by the jury.  In *People v. Barnett* (1998) 17 Cal.4th 1044, the Supreme Court held that even assuming an instruction on hot flight and immediate pursuit was erroneous, the instruction "could not possibly have prejudiced defendant" because the jury was

"specifically instructed to 'disregard any instruction which applies to a state of fact which you determine does not exist' and to 'not conclude from the fact that an instruction has been given that the Court is expressing any opinion as to the facts.' " (*Id.* at pp. 1153–1154, citing CALJIC No. 17.31; see also *People v. Richardson*, *supra*, 43 Cal.4th at p. 1020 [flight instruction "applied only *if* the jurors found flight had been shown; if they did not so find here, they would have disregarded the flight instruction as they were also instructed" in CALJIC No. 17.31]; *People v. Saddler* (1979) 24 Cal.3d 671, 684 [instruction to disregard inapplicable instructions is a consideration in assessing the prejudicial effect of an improper instruction].) Likewise, in *People v. Pettigrew*, *supra*, 62 Cal.App.5th 477, the Court of Appeal held that the accompanying CALCRIM No. 200 instruction to disregard inapplicable jury instructions "mitigated the potential for prejudice from [an] erroneously given flight instruction." (*Pettigrew, supra,* at p. 502.)

Here, instruction No. 200 told the jury that some instructions "may not apply, depending on your findings about the facts of the case" and told jurors to "follow the instructions that do apply to the facts as you find them." This amounts to the same directive to disregard inapplicable instructions given in the above discussed cases. If the jury found the circumstances of defendant's 4:00 a.m. trip to Taco Bell did not show awareness of guilt, it would have disregarded instruction No. 372 as instructed in No. 200. (See *People v. Silveria and Travis* (2020) 10 Cal.5th 195, 245 [reviewing court must presume jury understood and followed instructions].)

Further mitigating the harm from any error here, the prosecutor did not mention flight or the flight instruction in his closing argument. (See *Crandell*, *supra*, 46 Cal.3d at p. 870 [no harm where flight "instruction did not figure in the prosecutor's closing argument"].) Defense counsel brought up the issue of flight in his summation as part of his argument that Dominic was the more likely shooter. Contrasting Dominic's actions after the shooting with defendant's, counsel noted that Dominic was the one who fled from the scene, not defendant—who "stuck around," "went to Taco Bell and came back."

13.

Defense counsel reasoned to the jury that if defendant had really fired the shots, he would have taken off like Dominic had. These arguments, if anything, would have encouraged the jury *not* to apply the flight instruction and infer guilt from defendant's trip to Taco Bell.

Finally, although no witness affirmatively saw defendant pull the trigger of a gun that night, the circumstantial evidence of defendant's guilt was substantial. Gabriel identified defendant as the shooter without hesitation shortly after the incident; defendant had instructed Dominic to drive to the location where the shooting occurred, which was outside of the house where defendant was staying that night; and a handgun was found hidden in the garage at that house with exactly three spent shell casings, the same number of shots heard that night. The jury deliberated for less than one hour before finding defendant guilty on all counts, reinforcing that this was not a close case in which the flight instruction tipped the balance. (See *People v. Saddler*, *supra*, 24 Cal.3d at p. 684 [holding consciousness-of-guilt instructional error harmless based on the strength of the evidence and the fact the jury reached its verdict after 1.5 hours of deliberation].)

The court did not err in giving the flight instruction, and even assuming error, it is not reasonably probable that defendant would have received a more favorable verdict absent that instruction.

## III.    ACCESS TO JUROR CONTACT INFORMATION

Defendant next argues that remand is required because the trial court erred by denying his posttrial application for release of one juror's personal contact information to support a motion for new trial based on suspected juror misconduct.

### A.  Relevant Law

Following the recording of a jury's verdict in a criminal trial, the trial court must seal the record of "personal juror identifying information," including "names, addresses, and telephone numbers." (Code Civ. Proc., § 237, subd. (a)(2).) Thereafter, the

14.

defendant or defense counsel may petition the court for access to these records "to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose." (Code Civ. Proc., § 206, subd. (g); see Code Civ. Proc., § 237, subd. (b) [permitting petition by any person].) The court must set the matter for hearing if (1) the petition and the required supporting declaration "establish a prima facie showing of good cause" for releasing the personal information, and (2) there is no "compelling interest against disclosure," such as "protecting jurors from threats or danger of physical harm." (Code Civ. Proc., § 237, subd. (b).)[6]

In order to establish a prima facie showing of good cause in this context, a defendant must provide, at a minimum, a " 'sufficient showing to support a reasonable belief that jury misconduct occurred, … and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial ….' " (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.) "Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*People v. Cook* (2015) 236 Cal.App.4th 341, 346.) " 'Absent a satisfactory, preliminary showing of possible juror misconduct, the strong public interests in the integrity of our jury system and a juror's right to privacy outweigh the countervailing public interest served by disclosure of the juror information.' " (*Carrasco*, at p. 990.)

"Trial courts have broad discretion when ruling on a motion to release juror contact information." (*People v. Zamora* (2022) 73 Cal.App.5th 1084, 1090; see *People v. Avila* (2006) 38 Cal.4th 491, 604.) We review the denial of a petition for release of juror information under the deferential abuse of discretion standard. (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1087; *People v. Munoz* (2019) 31 Cal.App.5th 143, 165.)

---

[6] If the court sets the matter for a hearing, subdivisions (c) and (d) of Code of Civil Procedure section 237 outline the procedure for the hearing and specify the basis on which the court is to make a final determination on the petition.

Under this standard, we will not disturb the trial court's decision unless it was arbitrary, capricious, or patently absurd. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1185 ["A court abuses its discretion when it acts unreasonably under the circumstances of the particular case."].)

### B. Additional Background

On November 3, 2021, about one month after the jury's verdict and two days before the scheduled sentencing hearing, defendant filed a request to disclose juror information. The supporting brief stated that "[a]fter the completion of the jury trial," defendant's mother, Maria Moreno, informed defense counsel that she recognized Juror #4 from several prior contacts—although "she did not immediately recognize Juror #4 due to his wearing a face mask." The trial occurred during the COVID-19 pandemic, and it appears from the trial transcript that everyone in the courtroom was masked during the proceedings. According to the brief, Ms. Moreno knew Juror #4 to be an employee at a local storage facility where she stored her recreational vehicle (RV), and both she and defendant "would regularly have direct contact with Juror #4 in order to pay the monthly storage bill." In 2017, a license plate was stolen from Ms. Moreno's RV, and she expressed dissatisfaction with Juror #4's handling of the incident to his supervisor; Juror #4 "apparently became upset" that Ms. Moreno had escalated her complaint. Defense counsel argued that Juror #4 did not disclose that he knew defendant or defendant's mother, despite the fact that Ms. Moreno was listed as a potential witness (although she never was called to testify); and requested Juror #4's contact information to investigate his prior contacts with defendant and Ms. Moreno and how their prior relationship may have impacted his deliberations in the case. The request for disclosure was accompanied by a very brief declaration of counsel, which added no further details.

The People filed a lengthy opposition the following day, and the court addressed the motion at the November 5, 2021 hearing previously set for sentencing. After receiving oral argument from both sides, the trial court ruled as follows:

16.

"Okay. I did read the papers filed by both counsel, and I do note that Ms. Moreno was here most of the days of the trial. If this was an issue, she should have brought it up then. I don't see that there has been a sufficient foundation laid or there is a reason to divulge the information, and based on the totality of the circumstances and the defendant's current convictions and prior convictions, I don't see any justification to override that based on this mere assertion that there might be some issue that wasn't addressed at the time that allegedly the mother was aware of. So I'm going to deny the request for the disclosure of the juror information."

Sentencing was continued because of delays in producing the probation report.

On November 19, 2021, defendant filed a motion for new trial. The motion asserted claims of insufficient evidence, prosecutorial misconduct, and juror misconduct based on Juror #4's failure to disclose his prior knowledge of defendant and Ms. Moreno; and it was accompanied by a declaration by Ms. Moreno regarding her interactions with Juror #4 at the storage facility.

After several months of continuances due to delays in producing trial transcripts, the People filed their opposition, and the motion for new trial was heard on March 8, 2022. The parties orally argued only the sufficiency of the evidence and prosecutorial misconduct issues, and the court denied defendant's motion without expressing its views on the juror misconduct claim.

*C. Analysis*

Defendant argues that the trial court erred by denying his request for disclosure because the request stated a prima facie case of juror misconduct. Defendant does not challenge the denial of the subsequent new trial motion but argues it was an abuse of discretion for the trial court not to reconsider its ruling on the request for disclosure upon receiving Ms. Moreno's declaration attached to the motion for new trial. In the alternative, he argues trial counsel was ineffective for failing to renew the motion after obtaining the declaration from Ms. Moreno.

As the People note, the trial court did not deny the request for disclosure based on the absence of a declaration attesting to the facts asserted, although that would have been

proper grounds for denial. (See Code Civ. Proc., § 237, subd. (b) ["The petition shall be supported by a declaration that includes facts sufficient to establish good cause .…"].) Ms. Moreno's subsequent declaration repeated the same set of facts set forth in defendant's brief in support of the request for disclosure. The court's oral ruling on the request indicates that the court accepted as true the factual contentions in defendant's brief but simply found they provided insufficient "reason to divulge the [juror] information." The court also stated it was denying the motion based on the failure to raise the issue of potential juror misconduct earlier, during the trial, and based on defendant's current and prior convictions. These were reasonable grounds for denial, and we see no abuse of discretion.

Although the court did not use the statutory phrases "good cause" or "compelling interest," it is reasonably clear the court found there was a compelling interest against disclosure and there was no prima facie showing of good cause for disclosure. (See Code Civ. Proc., § 237, subd. (b) [predicates for setting a hearing].) Beginning with the latter and taking as true the facts asserted in the subsequent Moreno declaration, the trial court's finding of no prima facie showing was reasonable. Defendant's submissions convey only that Ms. Moreno kept her RV at the storage facility and interacted with Juror #4 there sometime in 2017—four years before the trial. Ms. Moreno did not describe how she "personally interacted" with Juror #4 in the office on the "several occasions" when they overlapped while she made her monthly payments; and there is no suggestion that *defendant* interacted with Juror #4 when he "often accompanied" his mother to the office. Nor did Ms. Moreno specify Juror #4's words or actions surrounding her reporting of the theft of her license plate, stating only that Juror #4 "became upset" and was "angered." These conclusory and vague descriptions are insufficient to make the requisite prima facie showing of good cause for disclosure. (See *People v. Cook*, *supra*, 236 Cal.App.4th at p. 346 ["Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported."].)

18.

There is also no indication that Juror #4 realized he knew defendant or his mother and intentionally withheld that information (the basis of the juror misconduct claim). Ms. Moreno did not aver that Juror #4 saw her attending the trial—where she, like everyone else in the gallery, was wearing a face mask—or explain why he should have recognized her by name on the list of potential witnesses provided during voir dire.

Relatedly, Ms. Moreno explained that she "did not immediately recognize[] Juror #4 … due to his wearing a mask while in court." This both undercuts the contention that Juror #4 recognized the Morenos, who were also masked, and fails to explain the timing of Ms. Moreno's reporting of her juror misconduct concern. The trial court found, and defendant himself acknowledged, that Ms. Moreno was present most of the days of the trial—which spanned six days. Even if she did not "immediately" recognize Juror #4, Ms. Moreno must have recognized him at some point before the jury was dismissed; and there is no explanation why she did not inform defense counsel of the prior relationship until sometime "[a]fter the completion of the jury trial." The trial court reasonably denied the motion based on the failure to bring up the suspected misconduct during the trial when the court could have addressed any issue before the trial concluded. (Cf. *People v. Carrasco*, *supra*, 163 Cal.App.4th at 991 [noting in affirming denial of petition "that defense counsel learned about the claimed juror misconduct during the trial, before a verdict was entered, and had an opportunity to try to rectify any problem she perceived"].)

Finally, even if defendant made a prima facie showing of good cause for disclosure, the trial court reasonably denied the petition based on a competing, compelling interest against disclosure—namely, juror safety. (See *People v. Tuggles* (2009) 179 Cal.App.4th 339, 382 [trial court may deny the request for juror contact information if the court finds a compelling interest for nondisclosure].) The court expressly cited defendant's "current convictions and prior convictions" as grounds for the denial. The current convictions were for serious, violent crimes including attempted

murder and shooting at an occupied vehicle (which was driving away from defendant). Defendant's prior convictions include violent crimes of second degree robbery with gang and firearm enhancements and felony domestic violence. Although there is no record of defendant or his mother threatening any jurors,[7] it was reasonable for the trial court to conclude that because of these convictions defendant and his associates posed a risk to juror safety, a concern that the disclosure statute expressly identifies as a compelling interest justifying nondisclosure of juror information. (Code Civ. Proc., § 237, subd. (b); cf. *Townsel v. Superior Court*, *supra*, 20 Cal.4th at pp. 1096–1097 [the trial court acted within its discretion in forbidding appellate counsel to contact jurors based in part on the severity of the defendant's convictions because "[t]he physical safety of jurors is of paramount concern for the judiciary," citing Code Civ. Proc., § 237, subd. (b)].)

For all of these reasons, we conclude the court acted within its broad discretion in denying defendant's petition for disclosure of juror contact information.[8] Because the

---

[7] Defendant argues that the lack of threats should defeat the People's juror safety argument, citing *People v. Granish* (1996) 41 Cal.App.4th 1117. Although the Supreme Court in *Granish* stated that juror identifying information could be ordered confidential to protect jurors from the type of harassment and improper contacts the defendant's relatives had exhibited in that case (*id.* at p. 1131), it did not hold that such conduct was necessary to deny a petition for disclosure on juror protection grounds.

[8] Although neither party raises the issue, we note that the trial court failed to memorialize its ruling in a minute order as required by the disclosure statute. (See Code Civ. Proc., § 237, subd. (b) ["If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure."].) The minutes from the court's November 5, 2021 would-be sentencing hearing reflected the denial of defendant's petition without stating any reasons. However, we do not deem this to be reversible error. As discussed above, the court orally stated its reasons on the record. There would be no practical benefit in requiring a minute order repeating the same information. Despite the mandatory nature of the language appearing in Code of Civil Procedure section 237, we decline to elevate form over substance in this case. This record leaves no doubt why the trial court denied defendant's petition.

Moreno declaration attached to the motion for new trial did not substantively add to the facts asserted in support of the petition for disclosure, and its omission was not a cited basis for the trial court's denial of the petition, trial counsel was not ineffective for failing to bring a new petition for disclosure upon obtaining such declaration.

## IV.    CUMULATIVE ERROR

Under the cumulative error doctrine, the cumulative effect of several trial errors may be prejudicial even if each would not be prejudicial when considered individually. (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1019.)  Because we have found no individual errors, we can find no cumulative error.  (See *In re Reno* (2012) 55 Cal.4th 428, 483.)

## V.    SECTION 654

As his final argument, defendant contends the trial court violated section 654 by imposing a concurrent sentence on count 4 and staying that sentence, because count 4 (felon in possession of a firearm) and count 5 (unlawful possession of ammunition) were based upon the same act of defendant possessing a firearm—the revolver found in the garage—with ammunition loaded inside it.  Defendant requests that we order the sentence on count 4 stayed and the abstract of judgment corrected accordingly.  This request is puzzling because the trial court orally pronounced that the term on count 4 *was* stayed pursuant to section 654, and the abstract of judgment already reflects a stayed term for count 4.

What defendant seems to be contesting is that the court ordered a concurrent term on count 4 before staying it.  Defendant argues that section 654 forbids the imposition of concurrent sentences under any circumstances for convictions falling within its ambit. He is mistaken.

Section 654 prohibits multiple punishment for crimes arising out of the same act or course of conduct.  (*People v. Reed* (2006) 38 Cal.4th 1224, 1226–1227.)  "[W]hen a

21.

court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence ….." (*People v. Duff* (2010) 50 Cal.4th 787, 796.) That is what the trial court did with respect to sentencing on counts 4 and 5. The People agree with defendant that the convictions on count 4 (felon in possession of a firearm) and count 5 (unlawful possession of ammunition) were based upon the same act of defendant possessing a firearm with ammunition loaded inside it, making those counts subject to section 654. (See *People v. Sok* (2010) 181 Cal.App.4th 88, 100 [separate sentences for unlawful possession of a firearm and for unlawful possession of ammunition violated § 654 where all of the ammunition was either loaded into the firearm or had been fired from that gun]; *People v. Lopez* (2004) 119 Cal.App.4th 132, 138 [same, where all of the ammunition was loaded into the firearm].)[9] Accordingly, the trial court imposed a sentence on both counts and stayed the execution of the sentence on count 4 pursuant to section 654.

That the sentence imposed on count 4 was ordered to run concurrent to the term on count 3 (assault with a firearm) is of no consequence because the court properly *stayed the execution of the sentence on count 4*. Defendant cites *People v. Alford* (2010) 180 Cal.App.4th 1463, which indeed states that "[i]mposition of concurrent sentences is not the correct method of implementing section 654, because a concurrent sentence is still punishment." (*Id.* at p. 1468.) Several Supreme Court cases contain similar proscriptions against using concurrent sentences to comply with section 654: " 'It has long been established that the imposition of concurrent sentences is precluded by section 654 [citations] because [under such a sentence] the defendant is deemed to be *subjected* to the

---

**9**      The discovery of the single live .22-caliber round separate from the revolver might have justified treating counts 4 and 5 as divisible offenses for which multiple punishment would not be precluded by section 654. However, the People state they have no objection to the section 654 stay of the term imposed on count 4, citing *People v. Lopez*, *supra*, 119 Cal.App.4th at page 138, in apparent agreement that the offenses were based on the same act of possessing the revolver with ammunition inside it.

term of *both* sentences although they are served simultaneously.' " (*People v. Duff*, *supra*, 50 Cal.4th at p. 796, quoting *People v. Miller* (1977) 18 Cal.3d 873, 887.)

However, these cases "only prohibit[] the imposition of concurrent sentences *in place of stays*." (*People v. Sweeney* (2014) 228 Cal.App.4th 142, 154, italics added.) That is, they prohibit imposing a concurrent term for a covered conviction without also staying the execution of that term. Given that the trial court did in fact stay the sentence imposed on count 4, "it can make no conceivable difference whether [that] term[] [is] nominally concurrent or consecutive." (*People v. Danowski* (1999) 74 Cal.App.4th 815, 821–822; see *Sweeney*, at p. 154 [rejecting the claim that the trial court erred by imposing concurrent or consecutive sentences on counts involving the same acts and then staying those sentences].) The trial court properly first imposed a concurrent sentence on count 4 and then stayed its execution under section 654, and the abstract of judgment need not be modified.

## DISPOSITION

The judgment is affirmed.

FRANSON, J.

WE CONCUR:

POOCHIGIAN, Acting P. J.

PEÑA, J.

23.